**KENYATTA K. STEWART, CORPORATION COUNSEL**
**CITY OF NEWARK-DEPARTMENT OF LAW**
**920 BROAD STREET, ROOM 316**
**NEWARK, NEW JERSEY 07102**
**Attorney for Plaintiff City of Newark**

**By:   Gary S. Lipshutz**
**Assistant Corporation Counsel**
**NJ Bar Id# 001861995**
**Telephone: (973) 733-5945**
**Facsimile: (973) 733-5394**
**Email: lipshutzg@ci.newark.nj.us**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CITY OF NEWARK,** | : |
| Plaintiff, | : Civ. No. |
| v. | : |
| **CITY OF NEW YORK; MAYOR BILL DE BLASIO, in his official capacity; COMMISSIONER STEVEN BANKS, in his official capacity,** | : **VERIFIED COMPLAINT FOR TEMPORARY RESTRAINTS, INJUNCTIVE RELIEF, AND DAMAGES** |
| Defendants. | : |

Plaintiff, City of Newark ("Newark"), for its claims against Defendants, City of New York ("NYC"), Mayor Bill de Blasio, and Commissioner Steven Banks, states and alleges as follows:

**PARTIES**

1.     Newark is a municipal corporation, established under the laws of New Jersey, with its principal business address located at 920 Broad Street, Newark NJ.

2.     Defendant NYC is a municipal corporation, established under the laws of New York, with its principal business address at City Hall Park, New York City, NY.

3.      Defendant Mayor de Blasio is the mayor of NYC, with a business address of City Hall Park, Manhattan, NY.

4.      Commissioner Banks is the Commissioner of the Department of Social Services for NYC, which department is composed of the Departments of Homeless Services and Human Resources Administration.  Commissioner Banks' business address is 150 Greenwich Street, New York, NY.

## JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff alleges a violation of the federal constitution.

6.      This Court has supplemental jurisdiction over the State-Law claims pursuant to 28 U.S.C. § 1367.

7.      This Court also has jurisdiction over the subject matter of the State-Law claims of this action pursuant to 28 U.S.C. § 1332 because it is a suit between parties of diverse citizenship, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      This Court has personal jurisdiction over the Defendants because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and Defendants have substantial contacts in New Jersey, related to the claims set forth in the Complaint.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of New Jersey, in this judicial district.

## ALLEGATIONS COMMON TO ALL COUNTS

**A.**    **NYC's Special One-Time Assistance Program ("SOTA Program")**

10.    Upon information and belief, the SOTA Program was enacted on August 31, 2017. Defendants established the SOTA Program to address the homeless issue in New York City.

11.    Upon information and belief, in order for individuals and families to be eligible for the SOTA Program, they were required to have been living in a shelter for at least ninety days and needed to be working with sufficient income to make future rental payments.

12.    Upon information and belief, Defendants have utilized the SOTA Program to send local homeless families to hundreds of cities across the country. In most cases, the receiving city is unaware of that SOTA Program recipients be relocated from New York City.

13.    Pursuant to the SOTA Program, Defendants pay landlords a full one-year's rental up front.  Apart from paying the families rent for a year, Defendants often paid travel expenses and the cost for furniture.

14.    The SOTA Program, under the direction of Defendants Mayor De Blasio and Commissioner Banks, requires the Department of Homeless Services ("DHS"), or provider-staff and case managers, to conduct walk-throughs of all apartments within the New York City limits, neighboring New York State communities, and local New Jersey Counties.

15.     Upon information and belief, if operated as intended, the SOTA Program required that if an apartment failed such a preliminary inspection, the landlord would be required to cure the defects observed by Defendants' inspectors in a timely manner before any SOTA funds could be received.

16.     Defendants, however, failed to inspect, or failed to adequately inspect, the apartments where Defendants were coercing SOTA recipients to move into.

17.     Defendants failed to provide a system to adequately hold participating landlords and real estate brokers accountable for illegal and/or uninhabitable housing.

18.     Upon information and belief, after the completion of the one-year tenancy, if a tenant moved out, or was evicted for failure to pay rent, the landlord was free to accept a new SOTA recipient.

19.     Upon information and belief, the SOTA Program was patterned off of the failed "Advantage," or "Work Advantage" program.  Advantage was a rental subsidy provided to households that lived in homeless shelters and provided up to two years of rent support on the condition that such families were working or participating in job training.[1]

20.     The Advantage program was suspended in April 2011, apparently because NYC learned that most families could not attain self-sufficiency after two years. Id.

21.     Advantage actually created a "revolving door to homelessness," with an estimated 25% of families returning to the shelter system after the vouchers expired. Id.

---

[1]     Mosi Secret, Clock Ticks for a Key Homeless Program, The New York Times (May 30, 2011), available at http://www.nytimes.com/2011/06/01/nyregion/new-york-city-close-to-ending-key-housing-program.html

**B.**    **Defendants' mistreatment of those SOTA recipients independently identified by Newark**

22.    Newark has identified several SOTA recipients who were unlawfully coerced to move to Newark by the Defendants, and who were directed to, or placed into, illegal and/or uninhabitable housing.

23.    The Defendants refuse to disclose to Newark the identities of all of the SOTA recipients that the Defendants placed in Newark.

24.    As a consequence of Defendants' refusal to disclose the identities of Newark-placed SOTA recipients, Newark was only able to identify a handful of recipients based upon their direct complaints to Newark officials.

**SOTA recipient 1**

25.    SOTA recipient 1 was living in New York City, in a NYC DHS affiliated shelter. See, Redacted Certification of SOTA recipient 1, attached to and incorporated into this Verified Complaint.[2]

26.    She felt pressured to leave the shelter.  She was told that she had overstayed her time there.  She was told she had to "buckle down."

27.    She was told by case managers in her shelter that she should look in New Jersey, in the cities of Newark or Paterson, because New York landlords were leery of the SOTA program and because she would find something quicker in New Jersey.

28.    The shelter's housing specialists did not assist her with looking for an apartment, and she was forced to hire an independent realtor.

---

[2]    SOTA recipient 1 is fearful of future reprisal by the Defendants and wishes to remain anonymous.  Plaintiff has honored her wishes and has filed a motion, contemporaneous to the filing of this Verified Complaint, to seal her identity and maintain her anonymity.  Plaintiff has provided her unredacted Certification to the Court for in camera review in connection with the motion to seal.

29.     The realtor stated he worked with other SOTA recipients to find applicable housing.   The realtor took her on "go-sees," with multiple SOTA participants at the same time looking at various apartments.

30.     She was able to spend only about 10 minutes inspecting the apartment that she eventually moved into.  She felt the need to jump at the first available housing unit that she found because of the pressure upon her to leave the shelter.

31.     To her knowledge, no representative from the City of New York ever inspected the unit.

32.     She signed a one-year Lease, which she signed "online."

33.     She received three checks from NYC each payable to the Landlord, up front, for a full years' rent, and another check to be paid to the realtor.  She gave all of the checks to the realtor who handled the rest of the financial transactions.

34.     She was told by case workers that she was "on [her] own" once the money was paid to the landlord.

35.     During her stay in the property, she had significant problems that she reported to the landlord: The bathroom ceiling collapsed; the heat never worked; the toilet stopped working and the landlord told her it was her problem to fix; there were roaches and rodents infesting the apartment; pipes broke which caused a flood that covered the floors with water; the water leaking from those broken pipes turned into ice due to the lack of heat in the Premises.

36.     She complained to her landlord but her complaints were never addressed.

37.     She reported the conditions to Newark Code Enforcement so that they could inspect the Premises.

38.     After a number of inspections, Newark Officials informed her that she needed to leave the apartment because Newark was going to condemn the building.

39.     She contacted NYC's DHS for assistance but was told that there was nothing NYC could do.  She eventually moved out of the Premises with the help of a friend.

**Sha-Kira Jones**

40.     Ms. Jones presently lives at 1-7 Lehigh Avenue, Apartment M2, (also known as 573-577 Elizabeth Avenue) Newark, New Jersey 07114.  She has three children that are six, three, and two years-old.  See Certification Sha-Kira Jones, attached to and incorporated into this Verified Complaint

41.     Before moving to Newark, she lived in a homeless shelter called 71st Street Residence on 71st Avenue (the "Shelter") in Jamaica Queens, New York. She believes that the Shelter was run by the NYC DHS.

42.     After living in the Shelter for about ten (10) months, she moved to Newark. At that time, she had two children that were the ages of five and two years-old, and was in the final term of her pregnancy with her third child.

43.     At that time, she was employed by the Brossman Risk Consulting Company where she worked as a security guard for commercial banks in various locations within Manhattan, New York.

44.     She later received her cosmetology license and worked in New York City at a hair-salon.

45.     Representatives of DHS advised her that she was eligible for the SOTA program because she had worked for more than ninety (90) days while living at the Shelter.

46.     She wanted to stay in the City of New York, but DHS advised her that New York City landlords do not participate in the SOTA program because SOTA vouchers are not sufficient to pay New York City rent.

47.     Immediately after being notified that she qualified for the SOTA program, she was told to go to the DHS headquarters at 33 Beaver Street in New York City.

48.     Upon arrival at DHS headquarters in March of 2018, two DHS representatives took her and other shelter residents on a bus to "take tours" of apartments in New Jersey (the "DHS Bus Ride").

49.     During the DHS Bus Ride, the two DHS representatives showed, to her and other shelter residents, apartments in the cities of Newark, Paterson, and East Orange in the State of New Jersey.

50.     She had never been to the State of New Jersey before.

51.     During the DHS Bus Ride, she was shown, and she went on, walkthroughs of the apartments in New Jersey with the DHS representatives, and each walkthrough lasted about ten minutes.

52.     She was told on the DHS Bus Ride that "it's a really fast process" and "if I liked one of the apartments, the paperwork would start immediately."

53.     She felt pressured to choose one of the apartments that she was shown in New Jersey because she was advised by the Shelter that "if you don't take what apartments are available – you start over."

54.     When "you start over," the SOTA program process takes a "very long time" and that "you may not be eligible for the SOTA program."

55.     About two days after the DHS Bus Ride, she chose and received a lease for an apartment located at 768 South 12th Street, Newark, New Jersey (the "South 12th Street Apartment").

56.     During the initial DHS Bus Ride, when she did the walkthrough of the South 12th Street Apartment, she was told by the DHS representatives, that it was a three-family apartment building.

57.     Four days after the DHS Bus Ride, she was told by DHS representatives to pick up a furniture check along with the keys to the South 12th Street Apartment, and DHS gave the rent checks directly to the landlord.

58.     About one week after the DHS Bus Ride, she moved into the South 12th Street Apartment.

59.     DHS representatives moved all of her belongings and family there, and dropped off five air-beds, then left.

60.     Shortly after living at the South 12th Street Apartment, the lights stopped working, the electric heater's knob "exploded," and the electricity would often short circuit, which would cause the refrigerator to turn off and the food to spoil.

61.     She called DHS headquarters to report the problems, but they never answered her calls nor assisted her with her living conditions.

62.     She notified her landlord about the electric heater's knob exploding but he did not fix it.

9

63.     During the time she lived at the South 12th Street Apartment, she noticed that the electric wiring into her apartment was exposed and the electricity would often not work.

64.     She went to PSE&G to inquire as to why her electricity was constantly not working, and PSE&G notified her that her apartment was not listed and that no meter was running to her third floor apartment.

65.     The area behind her apartment was a "drug house"; the apartment was infested with rats and mice; and the walls and floors were eroding.

66.     She called DHS with her complaints but no DHS representatives responded or helped.

67.     She contacted Newark Code Enforcement, who, after an inspection, advised her that the South 12th Street apartment was legally only a two-family dwelling and that her apartment was actually an "attic" that had been illegally converted into an apartment.

68.     Newark Code Enforcement filed a complaint against the landlord of the South 12th Street Apartment, ordering the landlord to fix the habitability issues.

69.     After Newark Code Enforcement filed the complaint, the landlord fixed some of the issues in the South 12th Street Apartment, such as the heat, and the electricity, which worked better than before but would still shut-off sporadically.

70.     However, sometime in January 2019, the same issues with the South 12th Street Apartment started to occur, and when she called the landlord, he refused to fix the heat and electricity.

71.     She called the Newark Code Enforcement once more at the end of January 2019. In addition to being an illegally converted apartment, Newark Code Enforcement found that there was no heat, the walls and ceilings were cracked, the electrical lighting and sockets were damaged, there was an illegal fire-escape, and the basement had severe plumbing issues that caused flooding.

72.     Newark Code Enforcement filed a second complaint against the landlord finding that the South 12th Street Apartment was a threat to the safety of its occupants and community, and unfit for human habitation, occupancy, and use, and thereby ordered its tenants to vacate the apartment.

73.     Having nowhere to live, the landlord paid for her stay at an Air BNB in New York City, and her intention was to stay in New York because that was where she truly wanted to stay and live.

74.     She had trouble registering her six-year-old child for school in New York City, so she returned to the South 12th Street Apartment after staying at the Air BNB in New York City for three (3) days.

75.     She ultimately stayed at the South 12th Street for the entire twelve (12) month period lease that the SOTA Program paid the landlord upfront.

76.     During her continued stay at the South 12th Street Apartment, the heat would sometimes work, the basement would still flood and later freeze from the cold temperatures.

77.     About six (6) months into her lease at the South 12th Street Apartment, the babysitter she hired to watch her three children quit because there was no heat or electricity in the South 12th Street Apartment.

78.     After the babysitter quit, she lost her job as a hairdresser in New York City because she needed to stay at home and care for her three children.

79.     Sometime in February 2019, the news station, "CBS2" did a cover story about the "forgotten families" that were living in horrible conditions in New Jersey after being placed there by the SOTA Program.

80.     As a victim of the SOTA program, she was interviewed and took part in CBS2's documentary to show her living conditions and express her grievances and feelings of abandonment by the DHS.

81.     Only after CBS2 aired the documentary, "forgotten families," did a DHS representative reach out to her for the first time since moving her into the South 12th Street Apartment.

82.     The DHS representative told her that she qualified for another one year rent assistance through the SOTA program, and DHS found her another apartment located at 1-7 Lehigh Avenue, apartment M2, Newark, New Jersey 07114 (the "Lehigh Apartment").

83.     After living at the South 12th Street Apartment for thirteen (13) months, DHS advised her that she had two-weeks to move into the Lehigh Apartment.

84.     The DHS representatives initially advised her that she qualified for a full-year rent for the Lehigh Apartment, at $1200 a month.

85.     However, a short time later, the DHS representatives changed their position, advising her that she qualified for only six (6) months, at $1400 a month.

86.     Although the DHS advised her that as a new policy, the SOTA program does an inspection of the apartment in conjunction, and with a New Jersey code enforcement official, there was no New Jersey code inspector nor was there an inspection ever done by a New Jersey code inspector.

87.     She moved into the Lehigh Apartment and noticed, once again, the same familiar issues that were prevalent at her original apartment. The Lehigh Apartment had no heat, there were cracks in the walls and ceilings, and the electric sockets were damaged and exposed.

88.     The DHS representative from the SOTA program gave the advance six-months' rent directly to her new landlord, totaling $8400.

89.     She called Newark Code Enforcement again because the Lehigh Apartment had no heat.

90.     After Newark Code Enforcement filed a complaint against the Lehigh Apartment landlord, the landlord fixed the heat.

91.     After the DHS paid the Lehigh Apartment landlord, she felt that the landlord didn't care about her or her living conditions because the landlord was already paid.

92.     At the Lehigh Apartment, she fell through the kitchen floor (damage to the floor had been covered up by linoleum) and fractured her wrist, and as a result, she is unable to work.

**Julie Rodriguez**

93.     Ms. Julie Rodriguez (723 Bergen Street, Newark) met with Natasha Allen, South Ward Senior Aide to City of Newark Mayor Ras Baraka.  Ms. Rodriguez complained of, and provided pictures, of mice infestation and no heat in her apartment. She complained that it was so cold that the water in her dog's bowl completely froze. She said she did not want to come to Newark, but rather, she wanted to go to Florida. She said she was told by NYC personnel that she had to use the SOTA voucher in New Jersey, Pennsylvania, or Connecticut, only.  Ms. Rodriguez has since relocated to Florida.  See Certification of Natasha Allen, attached to and incorporated into this Verified Complaint.

**Ranisha Howard**

94.     Ms. Ranisha Howard (182 Seymour Avenue, 3rd Floor, Newark) also met with Natasha Allen. Ms. Howard believed she was living in an illegally converted apartment, although ultimately it was determined that her apartment was a legal apartment.  Ms. Howard complained that she didn't see the apartment until move in day because the "Housing Specialist" from SOTA made contact with the homeowner and viewed the apartment.  Ms. Howard was told by a DHS employee that "we can't help you because you are a Newark resident now."  Id.

**Loreal Bell**

95.     Ms. Loreal Bell (678 South 20th Street, Newark) also met with Natasha Allen.  She complained of mice infestation, raw sewage in the basement, faulty wiring and no heat. Ms. Bell told the DHS representative that she didn't want to move to that apartment. She says she felt forced to move in because DHS "had already cut the

check." Ms. Bell complained to DHS, as well as the shelter where she had lived, that she did not have any heat from the time she moved in. DHS told her to contact the Newark officials with her complaints. Ms. Bell had no desire to live in Newark and wished to return to New York.  Ms. Bell feels like she was "dumped here and is now a Newark problem."

### C.   The Newark Ordinance

96.    On November 18, 2019, Newark's Municipal Council enacted Ordinance 6PSF-A, which supplemented Title XVIII of its Housing Code.  Newark's Municipal Council found that:

- many tenants in Newark rent substandard apartments due to the failure of landlords to maintain and upkeep their properties after the receipt of an initial Certificate of Occupancy; and

- many of these apartments are rented with substandard conditions that are unknown to the municipality and accepted out of desperation by tenants due to a lack of housing stock in the City of Newark; and

- many tenancies are subsidized by some form of rental assistance whether provided by the Federal Government, State of New Jersey, a County in the State of New Jersey or other States within the United States; and

- many of the agencies that provide rental assistance through vouchers or other form of rent subsidy do not require inspection of the various apartments that a recipient selects and therefore allow a recipient to select substandard housing due to a housing shortage; and

- municipalities throughout the United States have sent and continue to send their homeless population to the City of Newark without making provisions for them; and

- the number of homeless in the City of Newark has increased, which has also increased the number of homeless persons in shelters in the City.

97.     Based upon those findings, the new Ordinance requires, inter alia, that landlords must obtain (1) a certificate of code compliance upon a new tenancy; and (2) that any provider of a rental voucher or subsidy conduct an inspection of the premises on behalf of the voucher/subsidy recipient, and provide a report to the City of Newark detailing the nature of the rental assistance, a copy of the certificate of code compliance, a plan of action for the provision of rental assistance beyond the stated tenancy.

98.     The new Ordinance also forbids the pre-payment of one-year rent payments because of the perverse disincentive to the landlord to remediate any illegal/uninhabitable housing.

## COUNT ONE
### (CONSTITUTIONAL VIOLATION OF DORMANT COMMERCE CLAUSE)

99.     Newark repeats and realleges all of the paragraphs of the Verified Complaint as though they were set forth herein in their entirety.

100.     Pursuant to the United States Constitution's Dormant Commerce Clause, discrimination against interstate commerce means a differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.

101.     Defendant NYC's SOTA Program, under the direction of Defendants Mayor De Blasio and Commissioner Banks, unlawfully and differentially burdens interstate commerce occurring wholly outside the boundaries of New York State, in violation of the Dormant Commerce Clause of the United States Constitution.

102.    Defendant NYC's SOTA Program, under the direction of Defendants Mayor De Blasio and Commissioner Banks, requires that the DHS, or provider-staff and case managers, conduct walkthrough inspections of leasehold properties within the City of Newark, New Jersey, for SOTA recipients.

103.    Defendant NYC's SOTA Program, provider-staff and case managers, under the direction of Defendants Mayor De Blasio and Commissioner Banks, have conducted walkthrough inspections of leasehold properties in the City of Newark, New Jersey.

104.    Defendant NYC's SOTA Program, provider staff and case managers, under the direction of Defendants Mayor De Blasio and Commissioner Banks, have unlawfully directly transported, coerced and/or directed, SOTA recipients to illegal apartments and uninhabitable apartments, and have unlawfully coerced SOTA recipients to sign leases for such illegal and uninhabitable apartments.

105.    Defendant NYC's SOTA Program, provider-staff and case managers, under the direction of Defendants Mayor De Blasio and Commissioner Banks, have ignored complaints from SOTA recipients of the illegal and uninhabitable apartments where SOTA recipients were unlawfully placed.

106.    Defendant NYC's SOTA Program, provider-staff and case managers, under the direction of Defendants Mayor De Blasio and Commissioner Banks, unlawfully refuse to disclose to the City the identities and locations of those SOTA recipients that the SOTA Program directly placed in the City in illegal apartments and uninhabitable apartments.

107.   Defendant NYC's SOTA Program violates the Dormant Commerce Clause by directly controlling commerce occurring wholly outside the boundaries of New York City and the State of New York, and thereby exceeds the inherent limits of NYC's authority and is therefore invalid regardless of whether the SOTA Program's extraterritorial reach was intended by New York City's Mayor and City Council.

**WHEREFORE**, Newark requests that this Court:

(a)   Enter a Temporary Restraining Order, restraining Defendants from any further implementation of the SOTA program in Newark, NJ;

(b)   Enter a preliminary and permanent injunction, restraining Defendants from any further implementation of the SOTA program in Newark, NJ;

(c)   Order an accounting by Defendants, and any and all entities created or controlled by Defendants, to enable the identification of all persons and families relocated to Newark through the SOTA program, of all landlords in Newark that participated in the SOTA program, of all inspections of residences in Newark that were the subject of the SOTA program, of all amounts paid to landlords in Newark through the SOTA program, and of all persons who returned to New York from Newark after participation in the SOTA program;

(d)   Following the accounting, impose a constructive trust for the benefit of all participants in the SOTA program that wish to remain in Newark;

(e)   Specific performance requiring Defendants to facilitate the relocation of any families or persons who participated in the SOTA program, and wish to return to New York City; and

(f)   Awarding costs of suit, including reasonable attorney's fees and;

(g)   Awarding such other relief as is just and equitable.

## COUNT TWO
## (PUBLIC NUISANCE CLAIM)

108.   Newark repeats and realleges all of the paragraphs of the Verified Complaint as though they were set forth herein in their entirety.

109.   A public nuisance is an unreasonable interference with a right common to the general public, such as a condition dangerous to health, offensive to community moral standards, or unlawfully obstructing the public in the free use of public property.

110.   Circumstances that may sustain a holding that an interference with a public right is unreasonable includes conduct which involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience; or conduct of a continuing nature or which has produced a permanent or long-lasting effect, and as the actor knows or has reason to know, has a significant effect upon the public right.

111.   Defendants' conduct significantly and unlawfully interfered, and continues to significantly and unlawfully interfere, with the public health and safety, the public peace, the public comfort, and public convenience. Defendants have control over their conduct in Newark and that conduct had an adverse effect on the public right. Defendants have caused a public nuisance that has significantly harmed any considerable number of Newark's residents and the State of New Jersey's residents.

112.   Defendants' conduct is of a continuing nature which has caused permanent and/or long-lasting effects, and the Defendants know or have reason to know, that their conduct has a significant effect on the public right.

113.    Defendants knew, or should have known, based upon the failure of the two-year rental subsidy program Advantage, that a lesser term, one-year rental subsidy program (SOTA) would likewise fail.  Here, however, Defendants, knowing of the failure of Advantage, purposefully and coercively placed people outside of New York State simply to avoid future consequences of the expected failure of SOTA.

114.    Defendants knew, or should have known that their operation of the SOTA program, which coercively placed people in illegal and/or uninhabitable residences in which they would not have voluntarily chosen to live, without reasonable long-term support, creates or assist in the creation of a public nuisance in the City of Newark.

115.    This public nuisance is substantial and unreasonable. Defendants' actions caused and shall continue to cause an immeasurable amount of harm to Newark residents, businesses and the general public by placing any number of people in critical danger of becoming homeless in a place where they lack support.

116.    Defendants' actions created, and continue to create, perverse disincentives to landlords who stand to gain financially by providing illegal and uninhabitable housing to residents with the expectation of no repercussions, no action by the Defendants to cure the illegal and uninhabitable housing, and with the expectation that they can evict or constructively evict such SOTA recipients after the expiration of the one-time assistance program.

117.    Newark has been, and continues to be, directly and proximately injured by Defendants' actions in creating a public nuisance.

118.    Newark suffered special injuries distinguishable from those suffered by the general public.

119.   The public nuisance - i.e. the coercive conduct used to force citizens into poorly-vetted, illegal and uninhabitable housing, and the perverse disincentives stemming from the SOTA program, actually increase the likelihood of homelessness and extreme poverty created and perpetuated by Defendants.

**WHEREFORE**, Newark requests that this Court:

(a)   Enter a Temporary Restraining Order, restraining Defendants from any further implementation of the SOTA program in Newark, NJ;

(b)   Enter a preliminary and permanent injunction, restraining Defendants from any further implementation of the SOTA program in Newark, NJ;

(c)   Order an accounting by Defendants, and any and all entities created or controlled by Defendants, to enable the identification of all persons and families relocated to Newark through the SOTA program, of all landlords in Newark that participated in the SOTA program, of all inspections of residences in Newark that were the subject of the SOTA program, of all amounts paid to landlords in Newark through the SOTA program, and of all persons who returned to New York from Newark after participation in the SOTA program;

(d)   Following the accounting, impose a constructive trust for the benefit of all participants in the SOTA program that wish to remain in Newark;

(e)   Specific performance requiring Defendants to facilitate the relocation of any families or persons who participated in the SOTA program, and wish to return to New York City; and

(f)   Awarding costs of suit, including reasonable attorney's fees and;

(g)   Awarding such other relief as is just and equitable.

**CITY OF NEWARK**
**DEPARTMENT OF LAW**
*Attorney for Plaintiff*

By:  *s/Kenyatta K. Stewart*
     Kenyatta K. Stewart, Esq.
     Corporation Counsel


By:  *s/Gary S. Lipshutz*
     Gary S. Lipshutz, Esq.
     Assistant Corporation Counsel


Dated: December 1, 2019


## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I hereby certify that the matter in controversy is not the subject of any other action or proceeding pending in any Court, or in any pending arbitration or administrative proceeding.

**CITY OF NEWARK**
**DEPARTMENT OF LAW**
*Attorney for Plaintiff*

By:  *s/Kenyatta K. Stewart*
     Kenyatta K. Stewart, Esq.
     Corporation Counsel


By:  *s/Gary S. Lipshutz*
     Gary S. Lipshutz, Esq.
     Assistant Corporation Counsel


Dated:December 1, 2019

## <u>DEMAND FOR JURY TRIAL</u>

The Plaintiff hereby demands trial by jury as to all issues not appropriate for determination by the Court.

**CITY OF NEWARK**
**DEPARTMENT OF LAW**
*Attorney for Plaintiff*

By: *s/Kenyatta K. Stewart*
Kenyatta K. Stewart, Esq.
Corporation Counsel

By: *s/Gary S. Lipshutz*
Gary S. Lipshutz, Esq.
Assistant Corporation Counsel

Dated:December 1, 2019

## VERIFICATION

NATASHA ALLEN, of full age, hereby certifies and says:

1.   I am the South Ward Senior Aide to the Mayor Ras Baraka of the City of Newark, Plaintiff in this case.

2.   I have been charged with receiving and addressing complaints by citizens located in the South Ward of Newark, which complaints form, in part, the subject of the allegations set forth in this Verified Complaint.  I have read the Verified Complaint, and have personal knowledge of the information contained therein or have relied on information obtained through the sworn testimony set forth in the accompanying Certifications, to the extent that the statements therein are not made on information and belief.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By: _____
Natasha Allen
South Ward Senior Aide

Dated:   12/1/19