KENYATTA K. STEWART, CORPORATION COUNSEL
CITY OF NEWARK-DEPARTMENT OF LAW
920 BROAD STREET, ROOM 316
NEWARK, NEW JERSEY 07102
Telephone: (973)733-3880
Facsimile: (973)733-5394
Attorney for Plaintiff
City of Newark

```
                        UNITED STATES DISTRICT COURT
                           DISTRICT OF NEW JERSEY
                                            :
CITY OF NEWARK,                             :
                                            :Civ. No.
        Plaintiff,                          :
                                            :
v.                                          :CERTIFICATION OF SHA-KIRA JONES
                                            :
CITY OF NEW YORK et al.,                    :
                                            :
        Defendants.                         :
                                            :
                                            :
```

I, **SHA-KIRA JONES**, of full age hereby certify and say:

1. I am a former participant in New York City's Special One-Time-Assistance ("SOTA") program.

2. I presently live at 1-7 Lehigh Avenue, Apartment M2, (also known as 573-577 Elizabeth Avenue) Newark, New Jersey 07114.

3. I presently have three children that are six, three, and two years-old.

4. I have personal knowledge of the matters contained herein.

5. I make this Certification in support of the City of Newark's ("Newark") application for injunctive relief.

6. I do not have a pecuniary interest in the outcome of this litigation.

7. At the time of the signing of this Certification, I am of sound mind, unaltered by any medication (legal or illicit), and I am mentally competent to make the statements made herein.

8. I am not affiliated with or employed by Newark.

9. I make this Certification freely and voluntarily with no coercion and under no duress. I have not been threatened, paid, or otherwise compensated in connection with the statements made in this Certification.

10. Before moving to Newark, I lived in a homeless shelter called 71st Street Residence on 71st Avenue (the "Shelter") in Jamaica Queens, New York.

11. I understand the Shelter to be publically run by the City of New York's Department of Homeless Services (the "DHS").

12. I lived in the Shelter for about ten (10) months before moving to Newark.

13. At that time, I had two children that were the ages of five and two years-old, and was in the final term of my pregnancy with my third child.

14. At that time, I was employed by the Brossman Risk Consulting Company where I worked as a security guard for commercial banks in various locations within Manhattan, New York.

15. I later received my cosmetology license and worked in New York City at a hair-salon.

16. Representatives of DHS advised me that I was eligible for the SOTA program because I had worked for more than ninety (90) days while living at the Shelter.

17. I wanted to stay in the City of New York, but DHS advised me that New York City landlords do not participate in the SOTA program because SOTA vouchers are not sufficient to pay New York City rent.

18. Immediately after being notified that I qualified for the SOTA program, I was told to go to the DHS headquarters at 33 Beaver Street in New York, New York.

19. Upon arrival at DHS headquarters in March of 2018, two DHS representatives took me and other shelter residents on a bus to "take tours" of apartments in New Jersey (the "DHS Bus Ride").

20. During the DHS Bus Ride, the two DHS representatives showed, to me and other shelter residents, apartments in the cities of Newark, Paterson, and East Orange in the State of New Jersey.

21. This was the first time that I had been in the State of New Jersey.

22. During the DHS Bus Ride, I was shown, and I went on, walkthroughs of the apartments in New Jersey with the DHS representatives, and each walkthrough lasted about ten minutes.

23. I was told on the DHS Bus Ride that "it's a really fast process" and "if I liked one of the apartments, the paperwork would start immediately."

24. I felt pressured to choose one of the apartments that I was shown in New Jersey because I was advised by the Shelter that "if you don't take what apartments are available – you start over."

25. When "you start over," the SOTA program process takes a "very long time" and that "you may not be eligible for the SOTA program."

26. About two days after the DHS Bus Ride, I chose and received a lease for the apartment located at 768 South 12th Street, Newark, New Jersey (the "South 12th Street Apartment").

27. During the initial DHS Bus Ride, when we did the walkthrough of the South 12th Street Apartment, I was told by the DHS representatives, that it was a three-family apartment building.

28. Four days after the DHS Bus Ride, I was told by DHS representatives to pick up a furniture check along with the keys to the South 12th Street Apartment, and DHS gave the rent checks directly to the landlord.

29. About one week after the DHS Bus Ride, I moved into the South 12th Street Apartment.

30. The DHS representatives moved all of my belongings and family there, and dropped off five air-beds, then left.

31. I lived on the third floor of the South 12th Street Apartment which has two bedrooms.

32. Shortly after living at the South 12th Street Apartment, the lights stopped working, the electric heater's knob "exploded," and the electricity would often short circuit, which would cause the refrigerator to turn off and the food to spoil.

33. I called DHS headquarters to report the problems, but they never answered my calls nor assisted me with my living conditions.

34. I reached out to the Newark Fire Department and reported the explosion of the knob on the electric heater.

35. The Newark Fire Department advised me that I turn the electric heater off, and tell my landlord to fix the heater because it would cause a fire.

36. I notified my landlord about the electric heater's knob exploding but he did not fix it.

37. During the time I lived at the South 12th Street Apartment, I noticed that the electric wiring into my apartment was exposed and the electricity would often not work.

38. Thereafter, I went to PSE&G to inquire as to why my electricity was constantly not working, and PSE&G notified me that my apartment was not listed and that no meter was running to the third floor apartment.

39. During my time living at the South 12th Street Apartment, the area behind my apartment was a "drug house"; the apartment was infested with rats and mice; and the walls and floors were eroding.

40. I called DHS with my complaints but still no DHS representatives responded nor helped.

41. Sometime in October 2018, I called the Newark Code Enforcement, who, after an inspection, advised me that the South 12th Street was legally only a two-family dwelling and my apartment was actually an "attic" that had been illegally converted into an apartment.

42. Newark Code Enforcement filed a complaint against the landlord of the South 12th Street Apartment ordering the landlord to fix the habitability issues.

43. After Newark Code Enforcement filed the complaint, the landlord fixed some of the issues in the South 12th Street Apartment, such as the heat, and the electricity, which worked better than before but would still shut-off sporadically.

44. However, sometime in January 2019, the same issues with the South 12th Street Apartment started to occur, and when I called the landlord, he refused to fix the heat and electricity.

45. I called the Newark Code Enforcement once more at the end of January 2019.

46. In addition to being an illegally converted apartment, the Newark Code Enforcement found that there was no heat, the walls and ceilings were cracked, the electrical lighting and sockets were damaged, there was an illegal fire-escape, and the basement had severe plumbing issues that caused flooding.

47. Newark Code Enforcement filed a second complaint against the landlord finding that the South 12th Street Apartment was a threat to the safety of its occupants and community, and unfit for human habitation, occupancy, and use, and thereby ordering its tenants to vacate the apartment.

48. Having nowhere to live, the landlord paid for my stay at an Air BNB in New York City, and my intention was to stay in New York because that it where I truly wanted to stay and live.

49. However, having trouble registering my six-year-old child for school in New York City, I returned to the South 12th Street Apartment after staying at the Air BNB in New York City for three (3) days.

50. I ultimately stayed at the South 12th Street for the entire twelve (12) month period lease that the SOTA Program paid the landlord upfront.

51. During my stay at the South 12th Street Apartment, the heat would sometimes work, the basement would still flood and later freeze from the cold temperatures.

52. About six (6) months into my lease at the South 12th Street Apartment, the babysitter I hired to watch my three children quit because there was no heat or electricity in the South 12th Street Apartment.

53. After the babysitter quit, I lost my job as a hairdresser in New York City because I needed to stay at home and care for my three children.

54. Sometime in February 2019, the news station, "CBS2" did a cover story about the "forgotten families" that were living in horrible conditions in New Jersey after being placed there by the SOTA Program.

55. As a victim of the SOTA program, I was interviewed and took part in CBS2's documentary to show my living conditions and express my grievances, and feelings of abandonment by the DHS.

56. Only after CBS2 aired the documentary, "forgotten families," a DHS representative reached out to me for the first time since moving me into the South 12th Street Apartment.

57. The DHS representative told me that I qualified for another one-year rent assistance through the SOTA program, and found another apartment located at 1-7 Lehigh Avenue, apartment M2, Newark, New Jersey 07114 (the "Lehigh Apartment").

58. After living at the South 12th Street Apartment for thirteen (13) months, DHS advised me that I had two-weeks to move into the Lehigh Apartment.

59. The DHS representatives initially advised me that I qualified for a full-years rent for the Lehigh Apartment, at $1200 a month.

60. However, a short time later, the DHS representatives changed their position advising me that I qualified for only six (6) months, at $1400 a month.

61. Although the DHS advised me that as a new policy, the SOTA program does an inspection of the apartment in conjunction, and with a New Jersey code enforcement official, there was no New Jersey code inspector nor was there an inspection ever done by a New Jersey code inspector.

62. I moved into the Lehigh Apartment and noticed once again, the same familiar issues that were prevalent at my original apartment.

63. The Lehigh Apartment had no heat, there were cracks in the walls and ceilings, and the electric sockets were damaged and exposed.

64. The DHS representative from the SOTA program gave the advance six-months' rent directly to my new landlord, totaling $8400.

65. I called the Newark Code Enforcement again because the Lehigh Apartment had no heat.

66. After the Newark Code Enforcement filed a complaint against the Lehigh Apartment landlord, the landlord fixed the heat.

67. I felt that after the DHS paid the Lehigh Apartment landlord, he didn't care about me or my living conditions because the landlord was already paid.

68. At the Lehigh Apartment, I fell through the kitchen floor and fractured injured my hand ~~wrist~~, and as a result, am unable to work. I took a picture of the broken floor, which had been purposely hidden by a sheet of linoleum, and which I have attached to my Certification.

69. I currently receive no social services from the City of New York.

70. I currently have Medicare through the State of New Jersey.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By: _____
Sha-Kira Jones

Dated: November 13, 2019