JAMES E. JOHNSON
Corporation Counsel of the City of New York
100 Church Street
New York, New York 10007

By: Brian T. Horan
Doris F. Bernhardt (*pro hac vice*)
Assistants Corporation Counsel
212.356.2297/2296
bhoran@law.nyc.gov
dbernhar@law.nyc.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
-------------------------------------------------------------------- x

CITY OF NEWARK,

       Plaintiff-Crossclaim Defendant,

CITY OF JERSEY CITY,

       Intervenor Plaintiff,

CLASS OF AFFECTED TENANTS,

       Plaintiffs-Intervenors,

vs.

CITY OF NEW YORK; MAYOR BILL DE BLASIO, in his official capacity; COMMISSIONER STEVEN BANKS, in his official capacity,

       Defendants.
-------------------------------------------------------------------- x

**Document Filed Electronically**

Case No. 19-cv-20931-MCA-LDW

**DECLARATION OF MOLLY PARK**

**MOLLY PARK** declares, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the First Deputy Commissioner of the New York City Department of Homeless Services ("DHS"), which is within the New York City Department of Social Services

("DSS"). My responsibilities include oversight of the Rehousing Division, including the operation of the Special One-Time Assistance ("SOTA") program.

2.  I submit this declaration in support of the City of New York's ("NYC") motion against the City of Newark (" Newark") for judgment on the pleadings and to dismiss the Complaint as moot.

3.  NYC, through DSS, launched the SOTA program to help households with income move out of shelter and into permanent housing. The SOTA program provides one year of rental assistance that individuals and families can use for housing in locations of their choosing in New York City or elsewhere in the United States.

4.  NYC started the SOTA program in August 2017. Since then, NYC has overhauled the program to enhance vetting of SOTA apartments and applications; institute a system for monthly rental payments; improve support for SOTA recipients through a dedicated hotline; and ensure that SOTA recipients understand and agree to the terms of the program. These changes are permanent.

5.  Many enhancements were prompted by an investigation into an unscrupulous SOTA landlord in Newark, performed by the New York City Department of Investigation ("DOI"). The DOI's investigation and findings pre-date this lawsuit, though its report was publicly issued several days after the Complaint was filed. The DOI's December 5, 2019 public report, describing this investigation and detailing the changes DSS made to the SOTA program in response, is available at https://on.nyc.gov/3ro5ENT.

6.  NYC also made changes to SOTA based on its lived experience operating the program over a number of years.

7. The cumulative result is a program with numerous features that are entirely new; the SOTA program that exists today is fundamentally different from the one described in Newark's Complaint.

**Enhanced Due Diligence**

8. *2018-2019: The Apartment Review Checklist.* In October 2018, a little over one year into the program and in connection with the DOI investigation, NYC started revamping its apartment review procedures and created the comprehensive Apartment Review Checklist (ARC) and guidance document, true copies of which are annexed hereto as Exhibit 1. The ARC is a detailed safety and habitability assessment used by DSS to review apartments in NYC, the New York State counties of Nassau, Rockland, Suffolk, and Westchester; and in the New Jersey counties of Bergen, Essex, Hudson, Middlesex, Passaic, and Union. The ARC is used to check that conditions in the unit are properly maintained prior to approval of the SOTA application. DSS created the ARC with guidance from the NYC Department of Housing Preservation and Development, a NYC agency with expertise in housing maintenance. The ARC was further enhanced in 2019 to clarify and expand the checklist.

9. The ARC requires a review and assessment of common areas of the building in which the apartment is located and of each room and hallway in the apartment. The review encompasses security and fire safety. Reviewers must also verify that the apartment's electrical and plumbing systems appear to be in working order. The ARC reviewer must specifically document, among other things, any peeling or loose paint, the presence of insects or vermin, any leaks, whether heat is available, whether the floors are free of hazards and whether there are holes in the floors, ceilings, or walls by marking these conditions as "pass" or "fail."

10. Reviewers must certify that they have "visited the property located at the address indicated . . . and that the information in th[e] form has been answered correctly to the best of [their] ability." If the ARC reviewer believes an apartment may be a "cellar," "basement," or "attic," the apartment is flagged for secondary review and cannot pass review until a second onsite review is conducted by a DSS staff person with professional expertise in inspections. The ARC must be dated no more than 60 days before the client's projected move-in date.

11. Reviewers are given three tools to use while doing the ARC: a GFCI Receptacle tester, which tests the polarity and efficiency of the wiring of electrical outlets; a non-contact infrared thermometer, used to determine the temperature in the unit; and a laser distance measurer, used to measure the size of the rooms.

12. DSS also provides thorough training, retraining, and support for reviewers. DSS created a guidance document and a regimen for continuous training and conducts initial and follow-up trainings to all specialists and caseworkers on an ongoing basis. DSS has established a hotline for staff to call with any technical questions and has provided a process for escalations that trigger additional review for technical issues that may come up during the ARC walkthrough.

13. As a result of the DOI investigation, DSS also tightened its documentation requirements for landlords and brokers. For example, under the current SOTA landlord agreement, attached hereto as <u>Exhibit 2</u>, landlords must certify that they will comply with all applicable building and housing codes and maintain the apartment throughout the SOTA grant period. Brokers, in the request form required for them to be paid a fee, attached hereto as <u>Exhibit 3</u>, are required to attest that they do not own or control the property and confirm that the rental unit's use and/or type of occupancy is in compliance with the local jurisdiction's

standards, among other things. If the landlords' and brokers' signed attestations as to habitability are false, they could be subject to criminal penalties. DSS also requires a copy of the deed to the landlord's property.

14. These changes successfully addressed problems in the inspection and verification process that existed before DSS put the ARC in place in October 2018 and, to a more limited extent, before DSS completed implementation of the other changes set forth in the DOI report. In light of these improvements, there is no basis for any systemic allegation that apartments are not adequately reviewed and vetted.

15. *July 2020: Additional Review by the Office of Program Accountability.* Since July 2020, DSS has implemented an additional layer of safety and appropriateness review before approving any SOTA lease outside of NYC. The Office of Program Accountability ("OPA"), housed within DSS, conducts a secondary review of all materials submitted in connection with a SOTA application. OPA ensures that all necessary documentation of ARC walk-throughs is included in a SOTA application. OPA also conducts due diligence to confirm property ownership and verifies that SOTA applicants' income meets eligibility requirements for the selected unit. If OPA finds deficiencies in the SOTA application, the application cannot be approved, unless the deficiencies are addressed.[1]

---

[1] In light of COVID-19, DSS has been operating SOTA at reduced numbers. In addition to advising participants that they must comply with applicable quarantine rules, DSS has implemented virtual processes to ensure client safety in the apartment search process. Clients have the option of viewing apartments virtually if they do not want to do so in person. DSS will then arrange for a virtual client and ARC walkthroughs. SOTA applications, apartments, and landlords remain subject to all program requirements.

**Monthly Rental Payments**

16. *February 2020: Escrow System for Monthly Rental Payments.* DSS has also improved its ability to help SOTA recipients address apartment conditions that arise after they move out of shelter and into the apartment. As of February 2020, DSS uses an escrow system to provide landlords monthly rental payments. This system replaced the practice of paying landlords one year of rent up front in a lump sum. The escrow system allows SOTA recipients to request that rental payments be withheld in the event that their landlord fails to maintain or fix an issue with the apartment.

17. DSS has a step-by-step procedure for withholding rent when a landlord refuses to properly maintain the apartment or make necessary repairs, or if the tenant commences a housing court code enforcement case or similar proceeding against the landlord. In the event a SOTA recipient tells their landlord (in writing) about a problem, the landlord is obligated to fix it. If the landlord fails to do so, then SOTA recipients are instructed to contact the local housing code enforcement authority to request an inspection and obtain documentation of the problem. If the problem persists, and the recipient wishes to withhold rent, then they may call DSS and provide the documentation from the local housing code enforcement authority or, if applicable, the housing court. At that point, DSS will use the documentation submitted to determine whether withholding rent is an appropriate course of action.

18. If DSS determines that withholding rent is appropriate, it will notify the landlord that rent will be withheld until the problem is fixed. If and when the landlord provides satisfactory documentation that the problem has been resolved, DSS will resume making monthly rental payments and disburse the withheld rent.

19. This new system is detailed in the SOTA program documents, including the SOTA Landlord Agreement (Ex. 2); SOTA Participant Agreement, annexed as <u>Exhibit 4</u>; Notice of Escrow Payment Withholding and Notice of Payment Release After Withholding, annexed as <u>Exhibit 5</u>; and SOTA Information Sheet, annexed as <u>Exhibit 6</u>; and SOTA FAQs, annexed as <u>Exhibit 7</u>.  Under the SOTA Landlord Agreement, landlords must specifically confirm their understanding that if the unit is not properly maintained in compliance with local government requirements, the monthly rent will be withheld until the issues have been resolved.

20. As a result of this system, SOTA recipients, like any other tenant, are now able to address landlord negligence by suspending payment.  In addition to the threat of code enforcement proceedings, the threat of rent withholding creates a strong incentive for landlords to maintain their apartments in habitable condition.  To the extent the original version of the SOTA program did not give tenants and DSS sufficient tools to hold landlords accountable, the transition to the escrow system, including procedures for withholding monthly rent in appropriate circumstances, solves the problem.

**Improved Communication with SOTA Recipients**

21. *February 2020:  Hotline.*  SOTA recipients have always been able to reach DSS through its general client inquiry telephone number, which is open to all inquiries from the public.  However, in February 2020, DSS set up a dedicated hotline for SOTA to better serve SOTA recipients and their landlords.  The hotline is available both during and after the one-year period covered by the SOTA grant.

22. The hotline helps support SOTA recipients, including those who have moved outside of New York City, with information about resources in their local communities.  The hotline can help if the recipient is facing a loss or reduction of income and needs a referral for

7

services, or is otherwise having issues that could affect their ability to remain permanently housed. This additional resource facilitates the transition as SOTA recipients move out of shelter and into safe permanent homes using SOTA. It also supports SOTA recipients in their transition to the period following the year covered by their SOTA grants.

23. When SOTA recipients leave shelter they are specifically asked to contact the hotline if they are (i) having problems related to their housing that the landlord is not fixing; (ii) being evicted or threatened with eviction; (iii) facing a loss or reduction of income and need a referral for services to help them increase their income, such as job training or career services; or (iv) are in need of guidance on other services available in their communities, such as information on registering their children for school. *See* Ex. 6 (Information Sheet); Ex. 7 (FAQs).

## SOTA Is a Voluntary Program

24. *February 2020: Updated SOTA FAQs, Information Sheet and Participation Agreement.* Families and individuals in shelter are expected to consistently, diligently, and actively search for and locate permanent homes—something households in shelter are generally eager to do. Shelter and DSS staff help shelter residents apply for rental assistance programs like SOTA, as well as other available programs and services. They also assist households in searching for apartments and connecting to brokers. However, at the end of the day, shelter residents bear the responsibility and obligation of seeking permanent housing and the opportunity to live independently. It is my experience at DSS that most households in shelter wish to do so. For eligible households, a SOTA grant can be instrumental in achieving this goal.

25. SOTA participation is voluntary. Applicants select their own apartments and are fully appraised about the nature of the program. *See* Ex. 4 (SOTA Participant Agreement). To

8

help SOTA recipients fully understand SOTA, NYC has developed and continually updates the SOTA FAQs, the SOTA Information Sheet, and the SOTA Participant Agreement, which lay out the elements of the program, the obligations of SOTA recipients, and the services that are available to support them.  *See* Exs. 4, 6, and 7.

26.     In addition, shelter providers and DSS staff working directly with SOTA applicants are instructed to make sure the applicants have an individualized plan for how they will adjust to life in their new homes, including, for example, how they will commute to their jobs, educate and care for their children, and maintain or develop ties to their new community. The Hotline and Payment Information sheet, given to all clients exiting shelter with SOTA, advises participants to call the Hotline if they need guidance on services in their area.  *See* Ex. 6.

### SOTA in Newark

27.     There are no current SOTA recipients in Newark and therefore DSS does not currently operate the SOTA program in Newark.  The last of the leases entered into by a SOTA recipient moving into a residence in Newark expired in December 2020.  DSS has not accepted new applications for SOTA in Newark since December 2019.  As a result, no SOTA recipient has moved to Newark under the current version of the program described above.

28.     I am advised that Newark's Complaint makes individualized allegations with respect to five individual SOTA participants and that, with respect to three of them—Julie Rodriguez, Loreal Bell, and Ranisha Howard—Newark's papers do not set forth the dates when the individuals applied for SOTA and moved to Newark.  DSS has undertaken to ascertain when the walkthroughs of those individuals' Newark apartments took place.  The respective walkthroughs took place on April 4, 2018 for Ms. Rodriguez; March 2, 2018 for Ms. Bell; and January 28, 2019 for Ms. Howard.

**SOTA Rule to Be Issued**

29.     NYC is preparing a SOTA rule to be issued for public comment under the city's rule-making procedures and, in accordance with those procedures, finalized for adoption. The proposed rule will codify the major changes to the SOTA program including use of the ARC; the escrow system whereby landlords are paid month-to-month; and the hotline.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 12, 2021

*Molly Park*
_____
MOLLY PARK